IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| JOHNNY DAVID KEY ) | |
| ) | |
| v. ) | No. 2:10-0035 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:     The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 21). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 13),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff's DIB and SSI applications were properly filed before and considered

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

by the state Disability Determination Services ("DDS"), an agency operating under a cooperative agreement with the federal SSA. These applications were denied by DDS on initial review, and then again on reconsideration review. Plaintiff thereafter requested a de novo hearing of her case before an Administrative Law Judge ("ALJ"). The ALJ heard the case via videoconference on October 1, 2009. (Tr. 21-40) Plaintiff appeared with counsel and gave testimony. Testimony was also received from an impartial vocational expert hired by the government. At the conclusion of the proof, the ALJ took the matter under advisement, until November 23, 2009, when the ALJ issued a written decision denying plaintiff's claim to benefits. (Tr. 9-16) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since April 3, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairment: low back injury, status post L5-S1 fusion in September 2007 (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he must be able to alternate sitting and standing at thirty minute intervals if desired.

6. The claimant is capable of performing past relevant work as an assembly press operator, light exertional level, unskilled (SVP-2). This work does not require the performance of work-related activities precluded by the claimant's

>residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 3, 2007 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 11-14, 16)

On April 2, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3).

Following the final denial of his claim, plaintiff filed a new claim with the agency, alleging disability beginning on November 24, 2009, the day following the issuance of the ALJ's decision under review here. A fully favorable decision was rendered on the new claim on August 31, 2011, and benefits were awarded based on the determination that plaintiff had been disabled since November 24, 2009. (Docket Entry No. 22)

The subsequent, favorable decision of the SSA has no bearing on the denial of plaintiff's claim to benefits under review here. See Presley v. Comm'r of Soc. Sec., 23 Fed. Appx. 229, 231 (6th Cir. Aug. 9, 2001). If the ALJ's findings recited above are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id

## II. Review of the Record

Plaintiff injured his lower back at work in October of 2006. After conservative treatment and a return to work with modified duties, plaintiff continued to have significant pain, and ultimately was referred to a neurosurgeon, Dr. Michael Moran.

3

On May 18, 2007, Dr. Moran reported his first visit with plaintiff. (Tr. 304) Dr. Moran reviewed plaintiff's lumbar MRI, which revealed "grade 2 spondylolisthesis of L5 and S1 with bilateral spondylolysis and degenerative stenosis." Id. Dr. Moran felt that a congenital anomaly was likely present, and that plaintiff's preexisting spondylolisthesis became symptomatic when he aggravated the condition with his work-related injury. Id. The initial course of prescribed treatment included physical therapy and an epidural steroid injection, with continued light-duty work restrictions and reevaluation scheduled in one month. Id.

Dr. Moran next saw plaintiff on June 29, 2007, when it was reported that plaintiff "has had a little bit of improvement but he is still in a lot of pain and has been unable to work." (Tr. 301) Dr. Moran prescribed another month of physical therapy and two more epidural steroid injections, with reevaluation in six weeks. Id. On August 10, 2007, plaintiff was seen in followup, with unchanged spondylolisthesis symptoms and failure of the epidural steroid injections. Surgery was to be scheduled after repeat MRI due to his report of "progressive, intractable pain." (Tr. 299)

On September 21, 2007, Dr. Moran gave the following report:

> I saw Mr. Key in the office today. He is scheduled for an L5-S1 transforaminal lumbar interbody fusion next week. He had an up-to-date MRI. The MRI shows a grade 1/2 spondylolisthesis of L5 on S1 with severe bilateral foraminal narrowing, particularly on the left. This correlates with the area of pain. He has some degenerative changes at other levels, particularly L2-3 and L3-4 with some annular tears. He also appears to have some benign hemangiomas in the spine which are incidental findings.

(Tr. 297) On September 26, 2007, Dr. Moran performed the surgery, noting that plaintiff had "a long history of left leg radicular pain that had become intractable. He did have some back pain but by far his chief complaint was left leg pain." (Tr. 250)

4

After postoperative followup visits in November and December 2007 (Tr. 295, 296), at which plaintiff's improvement was noted, Dr. Moran recommended that plaintiff begin postoperative physical therapy. (Tr. 295) Plaintiff began physical therapy on January 4, 2008, and continued throughout the month with good results, reporting his subjective degree of pain as between 3 and 4 on a 10-point scale, reaching a level of 6 at the worst. (Tr. 337-44) After his physical therapy session on January 30, 2008, plaintiff was discharged to a home exercise program, having completed the prescribed course of therapy with good progress toward therapeutic goals. (Tr. 344)

Dr. Moran next saw plaintiff on February 8, 2008, four and one-half months out from his surgery. (Tr. 294) On that day, Dr. Moran noted that plaintiff has "some mechanical back pain but is slowly improving," with no neurological deficits. Id. Dr. Moran further noted as follows:

> He continues to report some left lumbosacral pain. This is primarily after prolonged standing and walking. He believes that he is making progress with the physical therapy. He reports improvement in his strength and his range of motion. He denies any radiating leg pain. There is no constant numbness or weakness or bowel or bladder dysfunction. ... On examination, Mr. Key appears to be in very mild distress. His lumbar spine is without point tenderness. He has a well-healed lumbar surgical incision with no signs and symptoms of infection. There is no sciatic notch tenderness. He has a negative straight leg raise. His deep tendon reflexes are 2+ and symmetric at the knees and ankles. He has 5/5 strength in all major muscle groups throughout the lower extremities.

Id. Dr. Moran recommended a four-week course of work conditioning followed by a functional capacity evaluation. Id. Plaintiff began his course of five-days-per-week conditioning on March 3, 2008, and completed the course on April 1, 2008. (Tr. 345-66) He started with 2 hours of conditioning and worked up to 8 hours, and was noted at every visit

5

to have made good progress toward goals.  Id.  To begin the work conditioning session, plaintiff's subjective pain rating was always between 3 and 5 on a 10-point scale; after work conditioning exercises, plaintiff consistently reported his pain as around a 6 on that scale.  Id.

On April 3, 2008, plaintiff presented to his physical therapist for a functional capacity evaluation, the results of which revealed his "light-medium physical demand classification." (Tr. 281, 282-90)  Dr. Moran reviewed this evaluation and agreed with its results, releasing plaintiff from care, and to return to modified duty work on April 18, 2008, with a final diagnosis of spondylolisthesis; a permanent restriction against lifting greater than 30 pounds; and a 25% Impairment to the Whole Person following maximum medical improvement achieved as of that date.  (Tr. 292-93)  Dr. Moran revealed that, after discussing with plaintiff his future employment, and plaintiff's intention to look for a job that is not in a factory, the doctor agreed that "that would be very advisable." (Tr. 292)  Dr. Moran also noted that he had written a final prescription for the narcotic Lortab and the muscle relaxer Soma, and that if plaintiff could not wean off the narcotic in the next couple months, he would have to be referred to a pain clinic.

On June 9, 2008, plaintiff underwent an independent medical evaluation arranged by his attorney at the time and conducted by Dr. John Bacon.  (Tr. 325-26)  Dr. Bacon's examination showed tenderness, muscle spasm, limited range of motion, and some muscle weakness in the lumbar region, with negative results on bilateral straight leg raise testing.  (Tr. 326)  Dr. Bacon noted that plaintiff had reached maximum medical improvement, with 27% impairment to the person as a whole, and permanent restrictions against bending, twisting, and lifting more than 15 pounds, plus the need to alternate sitting and standing every 15-20 minutes.  Id.

On August 7, 2008, plaintiff was interviewed and tested by a certified vocational evaluator and counselor, Mr. John W. McKinney. (Tr. 328-30) Mr. McKinney offered his preliminary opinions regarding plaintiff's vocational disability. After obtaining results on psychometric testing which indicated average intellectual functioning despite indications of a specific learning disability (Tr. 328), Mr. McKinney recounted plaintiff's employment and medical history. In addition, he noted plaintiff's report of current symtomatology:

> At present, Mr. Key continues to suffer ongoing pain symptoms of moderate to moderately severe intensity in his low back with radiation down the left side. His symptoms are reportedly exacerbated to intolerable levels with any type of appreciable physical activity and following exposure to cold/wet weather conditions. Overall, he experiences approximately four days each week where his symptoms are of greater than moderate intensity throughout the day and necessitate that he predominantly lie down or recline.

(Tr. 329) Mr. McKinney opined that plaintiff's impairment would preclude his return to previous work as well as roughly 75% of the existing employment opportunities in the local labor market. (Tr. 330) Mr. McKinney also opined that the combination of plaintiff's impairment level and the effects of his chronic pain above a moderate level of intensity result in the absence of any reasonable expectation that he could acquire, perform, and maintain competitive work. Id. Mr. McKinney thus considered plaintiff to be 100% vocationally disabled. Id.

On August 27, 2008, plaintiff presented for pain management in Dr. Jeffrey E. Hazelwood's office. (Tr. 367-68) Plaintiff described the intensity of his constant lower back pain as 4-5 out of 10 on average, improving with heat and frequent change of positions, and worsening with prolonged positions. (Tr. 367) On initial physical examination, plaintiff

7

showed no muscle spasm, but had diffuse tenderness to palpation and reported pain on range of motion testing. His neurological examination was largely normal. His gait was slow and stiff. (Tr. 367-68) Dr. Hazelwood's diagnosis was "[c]hronic low back pain, which appears very much mechanical." (Tr. 368) He prescribed a minimal dosage of the narcotic Lortab (5 milligrams, 2-3 times per day), as well as trials of the anti-inflammatory Daypro, the anti-spasmodic Baclofen, and a TENS (transcutaneous electrical nerve stimulation) unit. Also, plaintiff was instructed to begin a home exercise program. Plaintiff was to follow up with Dr. Hazelwood in four weeks. Id.

On September 25, 2008, plaintiff was seen in followup, and reported that the Lortab dose was insufficient. Straight leg raise testing was positive on the left, and he was noted to have an antalgic gait on the left. Dr. Hazelwood noted that he had "[v]ery legitimate pain in my opinion." (Tr. 373) Plaintiff's Lortab dose was increased in frequency to 3-4 times per day, Baclofen was increased, and Daypro was discontinued. Id.

On November 13, 2008, plaintiff returned to Dr. Hazelwood, who reported the following history of plaintiff's present illness:

> The patient returns to the Lebanon clinic for follow up of his chronic low back pain. He rates his pain as a 3-4/10 in intensity with medications. He states he has had no change in his pain since last visit. Today he is having a fairly decent day. He thinks Lortab is causing his eyes to be irritated and red over the past month. He continues to use his TENS unit, which helps. He is off work, but states he is looking for a job. He states his [workers' compensation] case was just settled and he now has open lifetime medical benefits. He has taken Ambien previously with no real help. His medications do allow him to be more active, do household chores, and exercise. He denies nausea, sedation, chest pain, shortness of breath, or rash.

(Tr. 375) Dr. Hazelwood did not make any changes to plaintiff's treatment regimen.

At visits to Dr. Hazelwood on February 19, March 19, and May 13,

8

2009, plaintiff's pain was reportedly worse due to flare-ups since moving his residence, walking on a treadmill for 30 minutes, traveling by car which required prolonged sitting, and cutting grass on a riding lawn mower. (Tr. 377-83) His narcotic prescription was continued at the same dose, and the muscle relaxant Robaxin was added. (Tr. 379) After no benefit was reported from Robaxin, Dr. Hazelwood changed the muscle relaxant prescription to Zanaflex on May 13, 2009, and also prescribed a Medrol dose pack (a steroid to control inflammation) to help with the flare-up. (Tr. 380-81)

Six days later, on May 19, 2009, plaintiff reported a 50% improvement in his pain, stating that the Medrol dose pack and the Zanaflex had definitely helped. (Tr. 384) Dr. Hazelwood noted that "[o]verall his pain medication allows him to sleep better, be more active, do household chores, and have a better quality of life." Id. On examination, motor strength was normal or nearly normal, some tenderness to palpation was noted but no spasm, and he was noted to have a non-antalgic gait and good range of motion throughout the lower extremities. Id. Dr. Hazelwood's impressions included the 50% improvement in plaintiff's pain, and the notation of "[r]ecent flare-up — now better." Id. On July 20, 2009, at his last documented visit to Dr. Hazelwood's office, plaintiff was noted to have no changes, with average pain rated 4 out of 10, negative results on straight leg raise testing, normal or near-normal motor strength in the lower extremities, no spasm, and a normal gait. (Tr. 386)

On July 30, 2009, Dr. Hazelwood completed a Medical Source Statement of Ability to do Work-Related Activities (Physical), in which he opined that plaintiff could lift or carry 10 pounds occasionally and less than 10 pounds frequently; that he could stand and/or walk for less than 2 hours out of an 8-hour workday; that he could sit for less than about 6 out of 8 hours and must periodically alternate between sitting and standing in order

9

to relieve discomfort; that he could not push or pull more than 20 pounds on an occasional basis; that he could never climb or crawl, and only occasionally engage in other postural activities; that his ability to reach in all directions (including overhead) is limited; that he could reach only occasionally; and, that his impairment limits his ability to tolerate vibration and precludes working at heights. (Tr. 333-36)

At plaintiff's hearing before the ALJ on October 1, 2009, he testified that he was born on September 9, 1969, and was forty years old as of the date of the hearing. (Tr. 24) He testified that since his back surgery in September 2007, he had been able to control his pain with prescription medications to the point that he did okay around the house, but not to the point that he was able to work outside in his yard. (Tr. 28) He testified that in order to work he would need a lighter job that allowed him to change positions every 20-30 minutes, including by lying down, when he needed to in order to relieve his pain. Id. He testified that he needed to lie down once a day, at midday. (Tr. 31) He testified that he had muscle spasms at least two or three times per day. Id. He testified that Dr. Hazelwood had recently increased the dosage of his pain medication; that he constantly walked with a limp; that he was considering asking about further surgery to try and improve his pain level; and, that he uses a TENS unit every night to help him sleep, but that he was still unable to lie down for more than three or four hours at a time. (Tr. 31-34)

At the conclusion of plaintiff's testimony, a vocational expert testified that the limitations assessed by Dr. Hazelwood would not allow any competitive employment, as they would not allow 8-hour workdays. (Tr. 38) In response to the ALJ's hypothetical question regarding an individual limited to light work with a sit/stand option every thirty minutes, the expert identified several available jobs and their numbers in relevant markets,

including the job of assembler (3,300 positions in the regional economy; 108,000 positions in the national economy). (Tr. 36-37) Also, based on plaintiff's testimony that his past relevant job as an assembly press operator did not preclude him from alternating between sitting and standing every 15 minutes, the expert testified that plaintiff could return to such work. (Tr. 35-36)

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be

12

used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in misconstruing the import of Dr. Hazelwood's medical source statement, in weighing the opinion evidence from plaintiff's treating sources, and in discounting the credibility of plaintiff's subjective complaints of disabling pain. The undersigned finds no merit in any of these arguments.

Plaintiff contends that the ALJ erred in characterizing Dr. Hazelwood's assessment as allowing for sedentary work. (Tr. 14) However, the ALJ had earlier referred to this assessment as "find[ing] limitations generally within the sedentary range and recommend[ing] a periodic sit/stand option." (Tr. 12) While it is clear that, as plaintiff points out, Dr. Hazelwood's assessment, if adopted, would not allow for eight hours per day

13

of sedentary work, any mischaracterization of the assessment as allowing full-time work is harmless, given the ALJ's focus on the particular exertional limitations assessed there rather than any perceived allowance for the full range of sedentary work, and in light of substantial evidentiary support on the record as a whole for a higher RFC.

In determining plaintiff's RFC, the ALJ took inventory of the opinions of record and then assigned weight according to the following rationale:

> Both of the physical residual functional capacity assessments (Exhibits 5F and 9F) find the claimant capable of medium work, Plateau Physical Therapy and Dr. Moran endorse a light-medium standard (Exhibits 7F and 8F), Dr. Bacon's opinion is for essentially light duty (Exhibit 11F), what appears to be Dr. Hazelwood's opinion is for sedentary work (Exhibit 14F), while Mr. McKinney offers a preliminary opinion of unemployability (Exhibit 12F). The undersigned has taken each of these opinions into account in formulating the above residual functional capacity [for light work with a sit/stand option at thirty minute intervals], and finds that the greatest weight should be accorded to his neurosurgeon due to the length of his contact with the claimant and his general knowledge and expertise, followed by the functional capacity evaluation which appears to be the most comprehensive examination of the claimant's abilities conducted. The more recent opinion of Dr. Hazelwood has been credited by the addition of a sit/stand option and by the overall reduction to the light exertional level. The least weight was given to the opinions of Dr. Bacon, who had little contact with the claimant, and Mr. [McKinney], who had none, and whose opinions are further described as preliminary.

(Tr. 14) The foregoing is a textbook application of the governing regulation, 20 C.F.R. § 404.1527(d), which calls for opinion evidence to be weighed with preference toward treating sources who have a longitudinal view of their patient's impairments, and whose opinions are supported by relevant evidence, consistent with the record as a whole, and offered within the realm of the source's specialization, if any. The undersigned cannot fault the ALJ for adopting the opinion of the treating neurosurgeon, Dr. Moran (Tr. 292), and the

14

comprehensive functional capacity evaluation cited as support for that opinion (Tr. 281-91), as modified to account for the more restrictive opinion of the treating pain management physician, Dr. Hazelwood. It is the province of the ALJ to weigh and resolve conflicts in the medical evidence, Baldwin v. Astrue, 2009 WL 4571850, at *4 (E.D. Ky. Dec. 1, 2009) (citing Burton v. Halter, 246 F.3d 762, 775 (6th Cir. 2001)), and substantial evidence supports the resolution reached here.

Moreover, while plaintiff challenges the ALJ's finding on the weight due his subjective complaints of pain, significant deference is due such findings involving the credibility of a disability claimant. See, e.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). However, there is no question that a claimant's subjective complaints can support a finding of disability -- irrespective of the credibility of that claimant's statements before the agency -- if they are grounded in an objectively established, underlying medical condition and are borne out by the medical and other evidence of record. 20 C.F.R. § 404.1529(c)(1)-(3); see, e.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997); SSR 96-7p, 1996 WL 374186, at *1, 5 (describing the scope of the analysis as including "the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record[;]" "a finding that an individual's statements are not credible, or not wholly credible, is not in itself sufficient to establish that the individual is not disabled."). Here, the ALJ offered the following rationale for the reduced weight given plaintiff's allegations:

15

> In terms of the claimant's alleged chronic extreme pain, while the undersigned does not doubt that the claimant experiences some degree of frequent, perhaps even daily, discomfort, the undersigned does not find it to be debilitating to the extent alleged and thus gives these allegations only some weight. The claimant has not been noted to be in significant distress at many of his visits to his treating physicians, and his pain levels reported during physical therapy were consistently lower than what is now alleged. There is also an indication that the claimant may be exaggerating his degree of pain (Exhibit 7F). The undersigned does not doubt that the claimant has significant restrictions in his abilities, but finds that the light exertional level and the sit/stand option of the residual functional capacity appropriately consider the net effect of these limitations as reported in the record as a whole.

(Tr. 13-14)

As referenced by the ALJ, the records of plaintiff's physical therapy during the first three months of 2008 and his subsequent treatment with Dr. Hazelwood establish his reports of an average level of pain estimated to be between 3 and 4 on a 10-point scale, increasing to around a 6 on that scale when work hardening exercises were performed. (Tr. 337-66) Likewise, it was reported by Dr. Hazelwood in 2009 that plaintiff's average pain was between 3 and 4 on a 10-point scale, and that his pain medication allowed him to be more active, do more household chores, and generally improved his quality of life. (Tr. 379, 384) Consistent with this report, plaintiff testified during his October 2009 hearing as follows:

> Well, as long as I regulate my pain with my, my prescriptions, I try to do a little bit around the house to help, you know to help my wife and I've got four children, and I just -- as long as I monitor my pain level, I seem to do okay around the house, but as far as going outside and try to mow the yard or anything like that, I'm unable to do anything like that. I have to have my children help.

(Tr. 28) In light of this evidence, and giving the ALJ's credibility finding the deference it is due, the undersigned cannot find error in her determination that plaintiff's pain was not so

severe as to preclude work at the light level which allows for a sit/stand option.

In sum, the decision of the ALJ in this case is supported by substantial evidence, and should therefore be affirmed by this Court.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record (Docket Entry No. 15) be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

ENTERED this 26th day of March, 2012.

                                                s/ John S. Bryant
                                                JOHN S. BRYANT
                                                UNITED STATES MAGISTRATE JUDGE